# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIEL LIENEMANN, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>      v.<br><br>KNORR-BREMSE AG; KNORR BRAKE COMPANY LLC; NEW YORK AIR BRAKE LLC; WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORPORATION; AND FAIVELEY TRANSPORT NORTH AMERICA, INC.<br><br>                Defendants. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Daniel Lienemann ("Plaintiff"), individually and on behalf of a class of all those similarly situated (the "Class"), brings this antitrust action against Defendants Knorr-Bremse AG, Knorr Brake Company LLC, New York Air Brake LLC, Westinghouse Air Brake Technologies Corporation, ("Wabtec") and Faiveley Transport North America Inc. ("Faiveley") (collectively, "Defendants"), and alleges based on personal knowledge, the investigation of his counsel, and on information and belief, the following:

## I.  INTRODUCTION

1. This class action challenges under Section 1 of the Sherman Act, 15 U.S.C. § 1, a series of unlawful agreements between the world's largest rail equipment suppliers to restrain competition in the labor markets in which they compete for employees.

2. Defendants Knorr, Wabtec, Faiveley, and their respective subsidiaries, are each other's top competitors for rail equipment used in freight and passenger rail applications. They also compete with each other to attract, hire, and retain various skilled employees, including rail industry project managers, engineers, sales executives, business unit heads, and corporate

officers. Prior to its acquisition by Wabtec in November 2016, Faiveley also competed with Knorr, and Wabtec and their subsidiaries to attract, hire, and retain employees.

3. The unlawful agreements between Knorr, Wabtec, and Faiveley included promises and commitments not to solicit, recruit, hire without prior approval, or otherwise compete for employees (collectively, "no-poach agreements"). The no-poach agreements were not reasonably necessary to any separate, legitimate business transaction or collaboration between the companies. They spanned several years and were monitored and enforced by high-level company executives, and had the effect of unlawfully allocating employees between the companies, resulting in harm to U.S. workers and consumers.

4. Beginning no later than 2009, senior executives at Knorr and Wabtec, including executives at several of their U.S. subsidiaries, entered into no-poach agreements with each other. Beginning no later than 2011, senior executives at certain U.S. subsidiaries of Knorr and Faiveley entered into a no-poach agreement with each other. And beginning no later than January 2014, senior executives at the U.S. passenger rail businesses of Wabtec and Faiveley entered into a no-poach agreement with each other.

5. By entering into no-poach agreements, Defendants substantially reduced competition for employees to the detriment of workers in this important U.S. industry. These no-poach agreements denied American rail industry workers access to better job opportunities, restricted their mobility, and deprived them of being able to negotiate for better terms of employment. Moreover, these no-poach agreements disrupted the efficient allocation of labor.

6. Defendants' no-poach agreements are *per se* unlawful restraints of trade that violate Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff seeks an order prohibiting such agreements and other relief.

7. In July 2015, Wabtec announced that it would acquire Faiveley for $1.8 billion. While investigating the Faiveley-Wabtec deal, the Antitrust Division of the United States Department of Justice (the "DOJ") uncovered these no-poach agreements entered into by Defendants to suppress and restrain competition for employees in the rail industry. On April 3, 2018, the DOJ's findings became public and the DOJ reached a settlement with Defendants, charging them with unlawfully agreeing to restrain competition in the labor markets in which they compete for employees, a per se violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

8. The DOJ confirmed that it will not seek to compensate employees who were injured by Defendants' agreements. Without this class action, Plaintiff and the Class will not receive compensation for their injuries, and Defendants will continue to retain the benefits of their unlawful collusion.

## II. JURISDICTION AND VENUE

9. Plaintiff brings this action to obtain injunctive relief and recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

10. The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), and 28 U.S.C. §§ 1331 and 1337.

11. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, as well as 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claims alleged herein occurred in this District, a substantial portion of the affected

interstate trade and commerce was carried out in this District, and one or more Defendants resides in, can be found in, and/or transacts business in this District.

12. Defendants are subject to the jurisdiction of this Court by virtue of Defendants' nationwide contacts and other activities, as well as their contacts with the Commonwealth of Pennsylvania. In particular, each Defendant, among other things: (a) transacted business throughout the United States, including in this District; (b) had substantial contacts throughout the United States, including in this District; and/or (c) was engaged in an illegal conspiracy that was, in part, entered into in this District and was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in this District. Additionally, Defendant Wabtec is based in, has facilities in, and personnel working in, this District.

13. This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, in that this action arises under the federal antitrust laws.

14. Venue is proper in this District under 28 U.S.C. § 1391(b), (c) and (d) and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, because, during the class period, Defendants resided, transacted business, were found, or had agents within this District, and a portion of the effected interstate trade and commerce discussed below was carried out in this District.

**III.   PARTIES**

15. Plaintiff, Daniel Lienemann, is a resident of Oakdale, Pennsylvania within this District. Plaintiff was employed at Wabtec during the proposed Class Period. During this period, Plaintiff made numerous failed attempts to advance his position and compensation at Wabtec. As

4

a result of the conspiracy as alleged herein, Mr. Lienemann earned less that he would have earned absent the alleged conspiracy.

16. Defendant Knorr-Bremse AG ("Knorr") is a privately-owned German company with its headquarters in Munich. Knorr is a global leader in the development, manufacture, and sale of rail and commercial vehicle equipment. In 2017, Knorr had annual revenues of approximately $7.7 billion.

17. Defendant Knorr Brake Company is a Delaware corporation with its headquarters in Westminster, Maryland, and is a wholly owned subsidiary of Defendant Knorr. It manufactures train control, braking, and door equipment used on passenger rail vehicles.

18. Defendant New York Air Brake LLC is a Delaware corporation with its headquarters in Watertown, New York, and is a wholly owned subsidiary of Knorr. It manufactures railway air brakes and other rail equipment used on freight trains.

19. Defendant Wabtec is a Delaware corporation with its headquarters in Wilmerding, Pennsylvania, in this District. Wabtec is a publicly-held company, listed on the New York Stock Exchange. Wabtec is the world's largest provider of rail equipment and services with global sales of $3.9 billion in 2017. It is an industry leader in the freight and passenger rail segments of the rail-equipment industry.

20. Defendant Faiveley Transport North America, ("Faiveley") formerly a subsidiary of Faiveley Transport S.A., is now a wholly owned subsidiary of Wabtec, and is a New York corporation headquartered in Greenville, South Carolina. On November 30, 2016, Wabtec acquired Faiveley, which had been a French société anonyme based in Gennevilliers, France. Prior to the acquisition, Faiveley was the world's third-largest rail equipment supplier behind Wabtec

and Knorr. Faiveley had employees in 24 countries, including at six U.S. locations. It developed, manufactured, and sold passenger and freight rail equipment to customers in Europe, Asia, and North America, including the United States, with revenues of approximately $1.25 billion in 2016. In the United States, Faiveley conducted business primarily through Defendant Faiveley Transport North America. Various Faiveley recruiting activities conducted prior to its acquisition by Wabtec are at issue in this complaint.

## IV.   THE RAILWAY INDUSTRY LABOR MARKET

21.   According to the Bureau of Labor Statistics, the number of railway worker jobs in 2017 in the U.S. was approximately 106,000. Wabtec employed approximately 18,000 full-time employees worldwide, and acquired approximately 5,700 employees in 24 countries from its acquisition of Faiveley.

22.   As of December 31, 2016, Knorr employed approximately 25,000 employees worldwide.

23.   In a competitive labor market, Defendants and their subsidiaries would compete with one another, as well as with firms at other tiers of the rail industry supply chain, to attract, hire, and retain skilled employees by offering attractive salaries, benefits, training, advancement opportunities, and other favorable terms of employment. Firms in the rail equipment industry employ a plethora of recruiting techniques, including using internal and external recruiters to identify, solicit, and otherwise assist in hiring potential employees.

24.   However, directly soliciting employees from another rail equipment industry participant is a particularly efficient and effective method of competing for qualified employees because those individuals likely already have the specialized skills necessary for the role. Specifically, through poaching, a company is able to save costs and avoid risks by

taking advantage of the efforts its rival has expended in soliciting, interviewing, and training employees, while simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend. Thus, if each Defendant was truly acting in its own independent self-interest, it would solicit the others' employees, including through offers of increased employment benefits and pay.

25. This competition in turn benefits employees because it increases the available job opportunities that employees learn about. It also improves an employee's ability to negotiate for a better salary, benefits, and other terms of employment. Defendants are the world's largest rail equipment suppliers and each other's top rival in the development, manufacture, and sale of equipment used in freight and passenger rail applications.

26. Defendants also compete with one another and with firms at other tiers of the rail industry supply chain to attract, hire, and retain skilled employees by offering attractive salaries, benefits, training, advancement opportunities, and other favorable terms of employment.

27. There is high demand for and limited supply of skilled employees who have rail industry experience. As a result, firms in the rail industry can experience vacancies of critical roles for months while they try to recruit and hire an individual with the requisite skills, training, and experience for a job opening. Employees of other rail industry participants, including the employees of Defendants' customers, competitors, and suppliers, are key sources of potential talent to fill these openings.

28. Firms in the rail industry employ a variety of recruiting techniques, including using internal and external recruiters to identify, solicit, recruit, and otherwise help hire

potential employees. Rail companies also receive direct applications from individuals interested in potential employment opportunities. Directly soliciting employees from another rail industry participant is a particularly efficient and effective method of competing for qualified employees. Soliciting involves communicating directly-whether by phone, e-mail, social and electronic networking, or in person-with another firm's employee who has not otherwise applied for a job opening. Such direct solicitation can be performed by individuals of the company seeking to fill the position or by outside recruiters retained to identify potential employees on the company's behalf. Firms in the rail industry rely on direct solicitation of employees of other rail companies because those individuals have the specialized skills necessary and may be unresponsive to other methods of recruiting. In addition, the rail industry is an insular one in which employees at different firms form long-term relationships and often look to their professional networks to fill a vacancy.

29. In a competitive labor market, rail industry employers compete with one another to attract highly-skilled talent for their employment needs. This competition benefits employees because it increases the available job opportunities that employees learn about. It also improves an employee's ability to negotiate for a better salary and other terms of employment. Defendants' no-poach agreements, however, restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in the labor market.

## V. THE UNLAWFUL AGREEMENTS

30. Beginning almost a decade ago, Defendants entered into no-poach agreements wherein they conspired with each other to eliminate competition between themselves for employees. These agreements were executed and enforced by senior company executives and implemented throughout the companies' U.S. subsidiaries. The No-Poach Agreements were not reasonably necessary to any separate, legitimate business transaction or legitimate collaboration between the companies and disrupted the normal bargaining and price-setting mechanisms that apply in the labor market. These no-poach agreements include:

### A. **Wabtec-Knorr Agreements**

31. Wabtec and Knorr entered into pervasive no-poach agreements that spanned multiple business units and jurisdictions. Senior executives at the companies' global headquarters and their respective U.S. passenger and freight rail businesses entered into no-poach agreements that involved promises and commitments not to solicit or hire one another's employees. These no-poach agreements primarily affected recruiting for project management, engineering, sales, and corporate officer roles and restricted each company from soliciting current employees from the other's company. At times, these agreements were operationalized as agreements not to hire current employees from one another without prior approval.

32. Beginning no later than 2009, Wabtec's and Knorr's most senior executives entered into an express no-poach agreement and then actively managed it with each other through direct communications. For example, in a letter dated January 28, 2009, a director of Knorr wrote to a senior executive at Wabtec's headquarters, "[Y]ou and I both agreed that our practice of not targeting each other's personnel is a prudent cause for both companies. As you so accurately put it, 'we compete in the market.'" Although the no-poach agreement was

9

between Wabtec and Knorr's U.S. passenger rail subsidiary, it was well-known to senior executives at the parent companies, including top Knorr executives in Germany who were included in key communications about the no-poach agreement. In furtherance of their agreement, Wabtec and Knorr informed their outside recruiters not to solicit employees from the other company.

33. In some instances, Wabtec and Knorr's no-poach agreement foreclosed the consideration of an unsolicited applicant employed by Wabtec or Knorr without prior approval of the other firm. For example, in a 2010 internal communication, a senior executive at Knorr stated that he would not even consider a Wabtec candidate who applied to Knorr without the permission of his counterpart at Wabtec.

34. Wabtec and Knorr's no-poach agreements also reached the companies' U.S. freight rail businesses. In July 2012, for example, a senior executive at Knorr informed a human resources manager that he could not consider a Wabtec employee for a job opening due to the no-poach agreement between Wabtec and Knorr.

35. Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with one another to ensure adherence to the agreements. For example, in February 2016, a member of Knorr's executive board complained directly to an executive officer at Wabtec regarding an external recruiter who allegedly solicited a Knorr employee for an opening at Wabtec. The Wabtec executive investigated the matter internally and reported back to Knorr that Wabtec's outside recruiter was responsible for the contact and that he had instructed the recruiter to terminate his activities with the candidate and refrain from soliciting Knorr employees going forward due to the existing no-poach agreement between the companies.

**B.** **Knorr-Faiveley Agreement**

36. Beginning no later than 2011, senior executives at Knorr and Faiveley reached an express no-poach agreement that involved promises and commitments to contact one another before pursuing an employee of the other company. In October 2011, a senior executive at Knorr explained in an e-mail to a high-level executive at Knorr that he had a discussion with an executive at Faiveley that "resulted in an agreement between us that we do not poach each other's employees. We agreed to talk if there was one trying to get a job[.]" Executives at Knorr and Faiveley actively managed the agreement with each other through direct communications.

37. In or about 2012, a senior executive at Knorr discussed the companies' no-poach agreement with an executive at Faiveley. This discussion took place at a trade show in Berlin, Germany. Subsequently, the executives enforced the no-poach agreement with each other through direct communications. This no-poach agreement was known to other senior executives at the companies, who directly communicated with one another to ensure adherence to the agreement. For example, in October 2012, executives at Faiveley stated in an internal communication that they were required to contact Knorr before hiring a U.S. train brake engineer.

**C.** **Wabtec-Faiveley Agreement**

38. Beginning no later than January 2014, senior executives at Wabtec and Faiveley entered into a no-poach agreement in which the companies agreed not to hire each other's employees without prior notification to and approval from the other company.

39. Wabtec and Faiveley executives actively managed and enforced their agreement with each other through direct communications. For example, in January 2014,

Wabtec executives refused to engage in hiring discussions with a U.S.-based project manager at Faiveley without first getting permission from Faiveley executives. In an internal e-mail to his colleagues, a Wabtec executive explained that the candidate "is a good guy, but I don't want to violate my own agreement with [Faiveley Transport North America]." Only after receiving permission from Faiveley did Wabtec hire the project manager. One month later, a Wabtec senior executive informed his staff that hiring Faiveley's employees was "off the table" due to the agreement with Faiveley not to engage in hiring discussions with each other's employees without the other's prior approval.

40. In July 2015, Wabtec and Faiveley publicly announced their intent to merge. Wabtec closed its acquisition of Faiveley on November 30, 2016. Presently, Faiveley is a wholly-owned subsidiary of Wabtec.

## VI. DOJ INVESTIGATION

41. Beginning in or around July 2015, the Antitrust Division of the United States Department of Justice, while investigating the proposed Faiveley-Wabtec merger, uncovered the unlawful no-poach agreements, and began an investigation into the employment practices of Defendants. As a result of its investigation, the DOJ concluded that Defendants had agreed to unreasonable restraints of trade that were per se unlawful under the antitrust laws. Specifically, the DOJ said, the no-poach agreements "were facially anticompetitive because they eliminated a significant form of competition to attract skilled labor in the U.S. rail industry."

42. On April 3, 2018, the DOJ filed a complaint alleging that Defendants' No-Poach Conspiracy violated Section 1 of the Sherman Act. The DOJ also filed a stipulated proposed final judgment in which Wabtec and Knorr agreed that the DOJ's complaint "state[d] a claim upon which relief may be granted against the Defendants under Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1."

43. In the stipulated proposed final judgment, Wabtec and Knorr are "enjoined from attempting to enter into, entering into, maintaining, or enforcing any No-Poach Agreement or No-Poach Provision." Wabtec and Knorr also agreed to comply with a variety of enforcement measures.

44. The DOJ has not sought monetary penalties of any kind against Defendants, and has made no effort to compensate individuals who were harmed by the Conspiracy. Thus, without this class action, Plaintiff and the Class will be unable to obtain compensation for the harm they suffered, and Defendants will retain the benefits of their unlawful conspiracy.

## VII.  CLASS ACTION ALLEGATIONS

45. Plaintiff brings this action on behalf of himself and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3). The Class is defined as follows:

> All persons employed by Defendants or their wholly-owned subsidiaries at any time from 2009 to the present. Excluded from the Class are senior executives and personnel in the human resources and recruiting departments of the Defendants and employees hired outside of the United States to work outside of the United States. The "United States" includes all fifty states, the District of Columbia, and all U.S. territories.

46. While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the Class contains hundreds, if not thousands, of members, as each Defendant employed tens of thousands of employees each year. The Class is so numerous that individual joinder of all members is impracticable.

47. The Class is ascertainable either from Defendants' records or through self-identification in the claims process.

48. Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was

generally applicable to all the members of the Class, hereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

      (a)    Whether Defendants agreed not to solicit each other's employees;

      (b)    Whether Defendants exchanged competitively sensitive salary information and agreed upon compensation ranges for positions held by Class members;

      (c)    Whether such agreements were per se violations of the Sherman Act;

      (d)    Whether Defendants fraudulently concealed their conduct;

      (e)    Whether and the extent to which Defendants' conduct suppressed compensation below competitive levels;

      (f)    Whether Plaintiff and the other Class members suffered injury as a result of Defendants' agreements;

      (g)    Whether any such injury constitutes antitrust injury;

      (h)    The nature and scope of injunctive relief necessary to restore a competitive market; and

      (i)    The measure of damages suffered by Plaintiff and the Class.

49.    Plaintiff's claims are typical of the claims of the members of the Class as they arise out of the same course of conduct and the same legal theories, and they challenge Defendants' conduct with respect to the Class as a whole. Plaintiff will fairly and adequately protect the interests of the Class.

50.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not

antagonistic to, those of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

51. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

52. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

53. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

54. Injunctive relief is appropriate with respect to the Class as a whole because Defendants have acted on grounds generally applicable to the Class.

## VIII. THE ANTICOMPETITIVE EFFECTS OF THE DEFENDANTS' ANTITRUST VIOLATIONS

55. The effects of Defendants' anticompetitive actions reduced competition for labor and wages in the United States rail industry. Defendants entered into, implemented, and monitored their no-poach agreements, and did so with the knowledge and intent and effect of fixing the compensation paid to their employees at artificially depressed levels.

56. The elimination of competition and suppression of compensation due to the Conspiracy affected all Class members. For example, Wabtec personnel received lower compensation as a result of not only Wabtec's illicit agreements with Knorr Brake, but also as a result of Knorr's agreement with Faiveley, and other rail suppliers.

57. The harm not only reached individuals who did, or otherwise would have, changed companies, but also extended to those who had no intention of leaving their companies, due to, inter alia, the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency.

58. While the Conspiracy constitutes a per se violation of the Sherman Act, Defendants and unnamed co-conspirators also exploited their collective market power in the relevant market, which is the labor market for rail equipment manufacturers and suppliers in the United States.

59. Wabtec and Knorr, along with their many subsidiaries, are the two largest competitors in this market—and, before its acquisition by Wabtec, Faiveley was the third-largest—and they possess significant market power. Acting in concert, Defendants and unnamed co-conspirators have the power to suppress compensation and eliminate competition in the relevant market.

## IX. FRAUDULENT CONCEALMENT

60. Before April 3, 2018 at the earliest, Plaintiff had neither actual nor constructive knowledge of the pertinent facts constituting their claims for relief asserted herein. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of any conspiracy until at the earliest April 3, 2018 when it was first revealed that an investigation by the DOJ has uncovered the unlawful no-poach agreements.

61. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy among Defendants to restrict

competition for class members' services through no-poach agreements, and to fix the wages and salaries of class members. In fact, Defendants had secret discussions about the conspiracy and agreed not to discuss it publicly or in the presence of class members.

62. Defendants' conspiracy was concealed and carried out in a manner specifically designed to avoid detection. Outside top executives and certain human resources and recruiting personnel, Defendants concealed and kept secret the illicit non-solicitation and wage-fixing agreements from class members. Defendants consciously avoided discussing the agreements in written documents that might be disseminated beyond the individuals involved in the conspiracy, to avoid creating evidence that might alert Plaintiff or other class members to the conspiracy's existence.

63. Defendants took many active steps to conceal the conspiracy from Plaintiff and Class members. They guarded their conspiratorial communications to keep them from coming to light, and they affirmatively misled Plaintiff and the Class as to what they did to retain or find employees. They made these misstatements in a variety of forms, including direct communications with Class members, codes of business conduct issued to Class members, and even public filings with regulatory bodies such as the Securities and Exchange Commission (the "SEC"). Specifically, as part of Wabtec's 2017 Form 10–K, filed with the SEC, Wabtec listed Knorr as its "main competitor" while reporting to shareholders that management "recognizes its responsibility for conducting the Company's affairs according to the highest standards" including conducting "its business activities within the laws of host countries in which the Company operates." Similarly, Knorr's Code of Conduct applied "to all employees of the Knorr-Bremse Group worldwide" and expressly expected "the entire workforce not only to observe internal regulations but also to observe the law."

64. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and the Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

## CLAIM FOR RELIEF
### (Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1)

65. Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

66. Defendants, by and through their officers, directors, employees, agents or other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1. Specifically, Defendants agreed to restrict competition for class members' services through no-poach agreements and agreements to fix the wage and salary ranges of class members, all with the purpose and effect of suppressing class members' compensation and restraining competition in the market for class members' services.

67. Defendants' conduct injured class members by lowering their compensation and depriving them of free and fair competition in the market for their services.

68. Defendants' agreements are per se violations of the Sherman Act.

69. Accordingly, Plaintiff and Class members seek three times their damages caused by Defendants' violations of Section 1 of the Sherman Act, as well as the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction prohibiting Defendants from ever again entering into similar agreements in violation of the antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class respectfully request the following relief:

(a) That the Court determine that this action may be maintained as a class action under Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure;

(b) That the Court Certify the Class defined in this Complaint pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), and designate Plaintiff as the representatives for the Class and its counsel as counsel for the Class;

(c) That as to the First Claim for Relief, the contract, combination or conspiracy, and the acts done in furtherance thereof, by all Defendants be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(d) The alleged combinations and conspiracy are per se violations of the Sherman Act;

(e) That judgment be entered for Plaintiff and members of the Class against Defendants for three times the amount of damages sustained by them as allowed by law;

(f) That Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law;

(g) That Plaintiff and the Class recover the costs of this suit, including attorneys' fees, as provided by law;

(h) That Defendants be enjoined from continuing their unlawful acts described herein.

(i) That Plaintiff and the Class be granted such other and further relief as the nature of the case may require or as may seem just and proper to this Court under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiff hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: May 25, 2018                             Respectfully submitted,

/*s/ Mary-Jo Rebelo*
Mary-Jo Rebelo, Esq.
PA. ID. No. 53539
BURNS WHITE, LLC
48 26th Street
Pittsburgh, PA 15222
Telephone: (412) 995-3347
Email: mjrebelo@burnswhite.com

*/s/ Robert N. Kaplan*
Robert N. Kaplan
**KAPLAN FOX & KILSHEIMER, LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax.: (212)687-980
Email: rkaplan@kaplanfox.com


Jonathan W. Cuneo
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, N.W.
Suite 200
Washington, D.C. 20016
Tel: (202) 789-3690
Fax: (202) 789-1813
Email: jonc@cuneolaw.com

*Attorneys for Plaintiff Daniel Lienemann*